**PHOENIX AIR GROUP, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**No. 98–602C.**

United States Court of Federal Claims.

Feb. 18, 2000.

Paul W. Killian, Sutherland Asbill & Brennan LLP, Washington, D.C., attorney of record for the plaintiff. James J. Briody, Sutherland Asbill & Brennan LLP, Washington, D.C., of counsel.

Glenn I. Chernigoff, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Mark A. Melnick, Assistant Director, David M. Cohen, Director, and David W. Ogden, Acting Assistant Attorney General, attorneys of record for the defendant. Ellen D. Washington, Senior Associate Counsel, Naval Air Systems Command Headquarters, Patuxent River, MD, with whom were D. Michael Fitzhugh, Associate Counsel, and Rosalind J. Woolbright, Assistant Counsel, of counsel.

## OPINION

HORN, Judge.

The above-captioned case comes before the court on the parties cross-motions for judgment upon the administrative record. Plaintiff, Phoenix Air Group, Inc., alleges that "[t]he government clearly and prejudicially violated and continues to violate 10 U.S.C. § 2304(a)(1)(A) by its sole-source acquisition of training flight services in Hawaii and the Far East pursuant to the Flight contract without any competition." In essence, the complaint alleges that the government violated federal requirements for competition in contracting when the Navy failed to use certain contract line items to acquire training flight services in Hawaii and the Far East, and exercised an option year of the contract to acquire the services under other contract line items. The government argues that the procured services were within the scope of the contract, and that the contracting officer's decision to use particular contract line items to acquire the services was an issue of contract administration, which Phoenix cannot challenge as a subcontractor.

The parties encountered considerable difficulty in working together and while assembling the administrative record in this case. The process included numerous requests by the plaintiff for documents during discovery, and a number of evasive responses by the government, at least one of which appears to have been incorrect. The court was forced to become actively involved and ultimately insisted on an affidavit from an employee of the defendant to verify responses offered by the Navy in court. To the court's chagrin, information supplied orally in court by counsel for the Navy and relayed, the court believes, too innocently, by DOJ counsel, proved to be inaccurate. Although the court believes it ultimately has been able to ferret out the accurate facts from the overly voluminous administrative record submitted, the difficulties encountered in discovery and the high-handed rhetoric and counter-accusations offered orally and in writing to the court slowed down the discovery process and forced the court to review each statement made by the parties and each document submitted with extra caution. The court believes that, had the Navy been easier to work with and more forthcoming early in the discovery process, both the court and perhaps even the plaintiff would have been less incredulous of the discovery responses and the in-court statements made by and on behalf of the defendant. Ultimately, the issues in this case presented a less complicated picture than the web that either the plaintiff or the defendant spun for the court. After carefully examining the briefs submitted by both parties, the extensive administrative record, and the contentions put forth at oral arguments, the court holds that the procurement of services at issue was within the scope of the contract, and that there was no violation of federal law.

### FINDINGS OF FACT

The plaintiff, Phoenix Air Group, Inc. (Phoenix), is a provider of training flight services to both the private sector and the government, including the United States Navy. The Navy uses training support from outside contractors such as Phoenix, as well as its own assets, to train its fleet units to be ready for combat. The Navy's Commercial Air Services (CAS) Program coordinates world-wide training support for the Navy's fleet combat readiness training and also for Naval Air Systems Command (NAVAIR) research and development activities. Commercial air services are acquired and managed for the Navy by the NAVAIR Program Manager Air 207 (the Program Manager), based in Patuxent River, Maryland.

The Program Manager solicits and receives the Navy's CAS requirements from various naval entities, and the Program Manager then works with a supporting NAVAIR contracting officer to establish a contract under which the Navy may acquire CAS. NAVAIR Instruction 5400.151, dated June 24, 1997, issued the charter for the Program Manager position. According to the charter, the Program Manager's primary mission is to:

(1) Manage the acquisition and life cycle support of assigned aircraft programs.

(2) Acquire and manage commercial flight services as requested by the Chief of

Naval Operations (OPNAV), and assigned by the Deputy Commander for Acquisition and Operations (AIR–1.0).

(3) Lead the development and maintenance of strategies to utilize Commercial Off The Shelf (COTS) aircraft and commercial support concepts benefiting [sic] Naval Aviation.

One of the naval entities for which the Program Manager procures CAS is the Commander–in–Chief, Pacific Fleet (CINCPACFLT). CINCPACFLT is the Navy entity responsible for the operational readiness of the Navy's Pacific Fleet.

In 1995, CINCPACFLT began to obtain CAS for training Pacific Fleet units in Hawaii and the Far East under a previously-existing contract, numbered DAHA90–93–D–0002 (ANG Contract 0002). ANG Contract 0002 was a five-year contract which had been competitively bid and awarded in 1992, and, under the contract, plaintiff Phoenix was providing training flight services to the Air National Guard Program Office. The contract had excess guaranteed hours because it had been set up to support a larger Air Force structure, and the Air National Guard was able to modify the contract to add the CINCPACFLT work for Hawaii and the Far East. CINCPACFLT continued to obtain CAS in this manner for Hawaii and the Far East until ANG Contract 0002 expired on March 31, 1998.[1]

In 1995, the Program Manager met with representatives of the Navy's Atlantic and Pacific Fleets to identify CINCPACFLT's requirements, including the projected need for contractor air services for fiscal years 1996 through 2001. A meeting was held on May 31 and June 1, 1995, to define Navy-wide requirements for fiscal year 1997. At this meeting, discussions were also held concerning commercial air services needed in the areas denominated as the "middle of the Pacific," or MIDPAC, and the "western Pacific," or WESTPAC. It was decided that the Air National Guard would provide the commercial air services for the MIDPAC and WESTPAC areas in fiscal year 1996, and that there would be a separate Memorandum of Understanding that the Navy and the Air National Guard would share assets for accelerated requirements.

For base year 1997, with options for four years to 2001, NAVAIR issued Request for Proposals (RFP) N00019–97–R–0026 on March 1, 1996. According to the solicitation, its purpose was "to obtain the services of aircraft, which are properly equipped, maintained, fueled, and operated by qualified contractor personnel, for use in a wide range of United States (U.S.) Government Commercial Air Services programs." The solicitation stated that the aircraft would be required "to perform operational services in support of the U.S. Navy, DOD, and other Government programs worldwide." [2]

The solicitation originally provided that offerors were to submit prices on contract line item numbers (CLINs) 0X35 and 0X36 relating to MIDPAC, and CLIN 0X37 relating to WESTPAC, which were under Part E of the solicitation, entitled "Requirements–MIDPAC/WESTPAC." Amendment 01 to the solicitation, however, changed these line items to Part E—Cost Reimbursement. A government-estimated price was provided, and offerors were instructed not to submit a price for these line items. These unpriced CLINs were added to the solicitation to account for CINCPACFLT's possible desire to use the contract for support in the future.[3]

---

1. Initially, pursuant to ANG Contract 0002, Phoenix provided services to CINCPACFLT units in Hawaii by ferrying planes to Hawaii, since no planes were assigned to a permanent base there. By combining the training flight requirements of CINCPACFLT and the Hawaii Air National Guard, however, it became beneficial for the government to base aircraft in Hawaii. As a result, in 1996, ANG Contract 0002 was modified for Phoenix to base three Lear aircraft at Hickam Air Force Base in Hawaii.

2. Both of these statements from the solicitation were later repeated in the awarded contract.

3. A Program Analyst for the contract who worked under the NAVAIR Program Manager stated that "[t]he original intent of the reimbursable CLINS was as a result of CINCPACFLT requesting the option and not the requirement to order services in MIDPAC/WESTPAC/and PACNORWEST [Pacific Northwest] areas. They [CINCPACFLT] had stated they would stay with the ANG [Air National Guard] contract for these services."

On May 3, 1996, NAVAIR received two proposals in response to the solicitation. Phoenix neither submitted a proposal, nor protested the solicitation requirements. Flight International, Inc. (Flight), the eventual recipient of the contract, proposed to perform the contract using Phoenix as a subcontractor, and a procurement review board recommended that the award be made to Flight. The Source Selection Authority determined that an award to Flight represented the best value to the government, and Flight was awarded the contract even though Flight did not submit the lower of the two bids.

Contract N00019–96–D–2047 (the 2047 Contract) was awarded to Flight on August 30, 1996, with a performance start date of October 1, 1996. The contract included a base year and four one-year options. The first two option years, running through September 30, 1999, have been exercised. The 2047 Contract is an indefinite-delivery/indefinite-quantity contract using task-orders [4] which includes three types of contract line items: (1) indefinite-delivery/indefinite-quantity CLINs, (2) requirements CLINs and (3) cost-reimbursable CLINs. The contract's "SCOPE OF CONTRACT" section states that:

> The majority of services will be required in the Continental U.S. (East and West Coast), Hawaii (MIDPAC), and the Far East (WESTPAC). These operations are normally conducted in designated Warning Areas (W) located on the East Coast around Norfolk, Virginia, Jacksonville, Florida, and Puerto Rico; on the West Coast around San Diego, California, and Whidbey Island, Washington; around

Honolulu, Hawaii (MIDPAC); and in Japan (WESTPAC). However, missions are not limited to these areas and operations may be required anywhere worldwide....

The 2047 Contract further provides that "[t]o support these missions, the contractor will be required to station aircraft at designated bases on the East and West Coasts.... During contract performance the Government may change these designated bases or establish additional designated bases." During the course of performance, the East Coast designated base was changed from NAS [Naval Air Station] Norfolk, Virginia, to Newport News/Williamsburg International Airport, Virginia. The West Coast designated base was changed from NAS Miramar, California, to NAS North Island, California. No other bases have been established.[5]

After securing the award of the 2047 Contract, Flight entered into a subcontract with Phoenix which began on the same date as the 2047 Contract, October 1, 1996. The agreement specifies that Phoenix is entitled to 100 percent of the hours ordered under CLINs 0X35 and 0X37. These are cost-reimbursement line items, which, according to the 2047 Contract, "will be negotiated prior to performance of the services, if the services are required, and the contractor will be provided a minimum of 60 days notice prior to start of the services." Line item 0X35 is contained in Part F of the 2047 Contract under columns specifically designated "CLIN" and "MID-PAC," and it lists the following under the column Supplies/Services: "JET AIC, TRACK, FERRY, UTILITY, TOW MISSIONS, BASIC GFE/CFE, EW Missions (Lear 36)."[6] Line item 0X37 is the same,

---

**4.** An indefinite-delivery indefinite-quantity contract "provides for an indefinite quantity, within stated limits, of supplies or services to be furnished during a fixed period, with deliveries or performance to be scheduled by placing orders with the contractor." 48 C.F.R. § 16.504(a) (1998).

**5.** In its motion for summary judgment, the defendant explained the basic operation of the 2047 Contract as follows:

> At the beginning of each contract year, the naval entities requiring the work provided funds to the Program Manager, and the Contracting Officer issued task orders obligating the funds for the majority of the guaranteed

hours for the year. During the year, schedulers located on the East and West Coast schedule the funded flight hours in these task orders to accommodate the requirements of Fleet units and other customers. Throughout the year, other hours, either guaranteed or excess, may be funded, and are thereafter ordered by task order and scheduled.

**6.** AIC and TRACK missions are Air Intercept Control and Tracking missions, respectively. According to the 2047 Contract, these missions:

> consist of an aircraft providing a tracked and/or vectored "Blip–on–the–Scope" radar target. The purposes of the missions are (1)

with the exception that it is listed under columns specifically designated "CLIN" and "WESTPAC."

While the performance of the 2047 Contract was ongoing, CINCPACFLT continued to obtain training services for Pacific Fleet units in Hawaii and the Far East under ANG Contract 0002 until it expired on September 30, 1997. On May 16, 1997, with the intention of replacing ANG Contract 0002 when it expired, the Air National Guard published a synopsis in the Commerce Business Daily announcing that solicitation RFP DAHA90–97–R–0017 would be released on June 10, 1997. The solicitation was to be for a "three (3) year, fixed price multi-year contract" to provide aircraft, maintenance and support operations for contracted flight services both within and outside of the continental United States, beginning on October 1, 1997. The issuance of RFP 0017 was delayed, however, so the Air National Guard extended ANG Contract 0002 in two 3–month increments through March 31, 1998.

In October of 1997, the Air National Guard publicly stated its intention to negotiate a six-month, sole-source contract with Phoenix to provide commercial air services beginning on April 1, 1998, immediately after the expiration of the ANG Contract 0002 extension. The six-month, sole-source contract would have run through September 30, 1998. The Air National Guard planned to have a follow-on competitive contract start in fiscal year 1999 in order to provide a six-month transition period for the new contractor. On November 14, 1997, Flight protested the proposed contract with Phoenix to the General Accounting Office (GAO) and challenged the

justification for a sole-source contract. In response to the protest, the Air National Guard canceled its plans for the sole-source contract and decided to issue the previously-proposed RFP 0017 in December 1997 for contract performance to begin April 1, 1998.

However, on or around December 17, 1997, the United States Air Force directed the contracting officer for the FAKER Program Office,[7] not to issue RFP 0017 due to a lack of funds for fiscal year 1999 and beyond. On January 22, 1998, the Air Force notified all parties in writing, including Phoenix, that the program which directed the issuance of ANG Contract 0002 would be canceled at the end of fiscal year 1998 because the program would not be funded.

After the cancellation of the FAKER program, CINCPACFLT decided on a two-stage approach to acquiring its training flight services. As a long-term solution, CINCPACFLT wanted to initiate a new, five-year competitive acquisition with a start date of October 1, 1998. For the short-term, CINCPACFLT desired a competitively-bid contract to bridge the gap between the end of ANG Contract 0002 and the proposed beginning of the new, long-term contract on October 1, 1998.

For the long-term acquisition of services, in March and April of 1998, CINCPACFLT contacted the Navy's Fleet Industrial Supply Center (FISC) in Pearl Harbor, Hawaii. CINCPACFLT wanted to obtain a five-year contract beginning on October 1, 1998 for Fleet training services for the Navy, with the ability to serve other Defense Department customers as well. On April 21, 1998, CINC-

---

train fleet operators on the use and capabilities of their equipment; (2) evaluate system capabilities (e.g., operational, calibration, limitations, etc.); (3) train fleet operators to function in an operational and/or hostile environment; (4) train fleet operators in the proper procedures for tracking aircraft and/or missiles and/or vectoring the same; and (5) provide RDT & E [Research, Development, Test & Evaluation] support as radar target, chase aircraft, etc.

UTILITY missions involve internal cargo and/or passenger movement, while FERRY missions result in the movement of aircraft to various locations. For TOW MISSIONS, BASIC GFE/CFE, the contractor's aircraft tows targets which are fired upon by military aircraft and ships utilizing

a variety of air-to-air and surface-to-air weapons. The towed targets may be government-furnished equipment (GFE) or contractor-furnished equipment (CFE). EW missions are electronic warfare missions which consist of "the contractor emitting a signal to simulate a radar transmission of a threat radar; emitting a signal-to-jam (blank-out) radar, communications, and other electronic systems; and simulating a threat force approaching from various directions, speeds, and altitudes."

7. The FAKER Program was the name of the program through which ANG Contract 0002 had been issued.

PACFLT's Director of Naval Operations requested FISC's assistance in developing a fully competitive, best value contract for services, and CINCPACFLT committed to provide $3 million in funding per year for the base three-year contract period. CINCPACFLT gave FISC a Performance Work Statement for the requested services and promised to assist in developing contract documentation. On April 23, 1998, a synopsis submitted by FISC was published in the Commerce Business Daily. The synopsis announced solicitation RFP N00604-98-R-0016 (FISC RFP 0016) for a fixed-price, indefinite-delivery, indefinite-quantity type contract to provide contracted flight services for CINCPACFLT. On that same day, FISC stopped action relating to the proposed contract. On May 1, 1998, FISC published a notice in the Commerce Business Daily which officially canceled FISC RFP 0016. According to an issue paper later presented by CINCPACFLT, "[t]he FISC effort for a follow-on contract was suddenly dropped when [the NAVAIR Program Manager] asserted that they were the only agency authorized to procure these types of services for the Navy. . . ." The issue paper noted that "the FISC contracting effort was halted and not resolved in time to contract for [fiscal year 1999]."

During this same time period, late 1997 and the first several months of 1998, CINCPACFLT also was examining possible methods of obtaining short-term commercial air services. The parties have stipulated that Gary F. Phenning, a Supervisory Electronics Technician and the Chief Engineer for the Airborne Threat Simulation Group, as well as the official CINCPACFLT representative in the continental United States for airborne threat simulation devices, believed that the Navy could have purchased some services by using unexercised options in the 2047 Contract with Flight. These options related to commercial air services in the Pacific Northwest (PACNORWEST), MIDPAC and WESTPAC operational areas. Another possible avenue was to obtain flight services through Air Force contract number F29601–

97–D–0113 (AF Contract 0113) with Syndetix, Inc., until a long-term contract could be obtained. CINCPACFLT was working on this alternative with the Army Big Crow Program Office, which was administering AF Contract 0113.

In February of 1998, CINCPACFLT found that the price for Pacific Region services under the 2047 Contract was higher than the price which could be obtained through Big Crow. CINCPACFLT decided to procure services through Big Crow, primarily because of the cost savings, but also because CINCPACFLT still intended to compete and award a long-term commercial air services contract which would begin on October 1, 1998. CINCPACFLT did not want to activate portions of the 2047 Contract which might preclude it from entering into a competitive long-term contract. On April 1, 1998, the Air Force Research Laboratory[8] amended a delivery order for AF Contract 0113 to add work for CINCPACFLT, the ANG, and the Air Force for the period of April 1, 1998 through September 30, 1998, and the work was then subcontracted to Phoenix. On April 1, 1998, however, Flight protested the modification of the delivery order to the GAO, alleging that the order for additional services was improper because it was not within the scope of AF Contract 0113 and the services were available under Flight's 2047 Contract. The Air Force subsequently canceled the delivery order modification on or about May 22, 1998.

By this time, the date for a planned military exercise called Rim of the Pacific 1998 (RIMPAC) was fast approaching. The United States Navy and naval forces from six other nations were to participate in the exercise, which eventually took place from July 6, 1998 through August 6, 1998 in the Pacific Ocean near Hawaii. Acting for the Big Crow Program office, the Air Force, with CINCPACFLT's concurrence, issued letter RFP F29601–98–R–0014 (RFP 0014) on May 29, 1998. The Air Force issued RFP 0014 with an unusual ten-day response period,

---

**8.** The Air Force Research Laboratory, Kirtland AFB, New Mexico, is the contracting activity for the Army Big Crow Program Office.

noting the urgent and compelling exception[9] to the Competition in Contracting Act requirement of a thirty-day response time. The cited basis for the urgent and compelling justification was to continue the support contemplated under the previously-canceled delivery order, since CINCPACFLT now had no support for the upcoming RIMPAC exercise. Flight and another contractor protested the issuance of the letter RFP 0014. Flight argued that there was no unusual and compelling urgency, that the RFP was in contravention of requirements to maximize competition, and that the work in the RFP was included in Fight's competitively-awarded 2047 Contract. Letter RFP 0014 was subsequently canceled.

Eventually, the Contracting Officer for the 2047 Contract issued Task Order 0079 under the 2047 Contract in partial support of the RIMPAC 1998 exercise. The necessary commercial flight services were ordered in Task Order 0079 under the existing priced East Coast CLINs 0103AB, 0104AB, and 0107AB and West Coast CLINs 0122AB and 0123AB. Aircraft ferrying from the East Coast designated base in Virginia to Hawaii was acquired via East Coast special ferry CLIN 0119. In order to move aircraft from the West Coast designated base in California to Hawaii, West Coast special ferry CLIN 0133 was employed.

The use of particular CLINs for the RIMPAC 1998 exercise resulted in a disagreement between Flight and Phoenix. When Flight notified Phoenix of the RIMPAC delivery order on June 22, 1998, Phoenix responded on June 23, 1998:

> The contract between Flight and Phoenix is clear. Phoenix has 100% of any Hawaii work, which is defined as MIDPAC in the contract....
>
> * * *
>
> West Coast and East Coast work (including Puerto Rico) are clearly defined and they do not include *"around Honolulu, Hawaii (MIDPAC)"* which is separately described. Nor does "Site Activation", as defined at para. C–15 (CLIN 0X45) have

any bearing on the proper CLIN to use for these MIDPAC service requests.

> There is no definition of "Hawaii (MID-PAC)" which includes using West Coast or East Coast CLINs as you propose and under the terms of the cooperative agreement, we are entitled to separate, negotiated rates for this work. You do not have the right to use (or subtract) hours from specifically defined East and West Coast CLINs to perform the "Other Hours" set forth under Exhibit A to our contract, including those for MIDPAC.

(Emphasis in original.) Flight responded that same day, June 23, 1998, as follows:

> The points raised in your most recent letter fail to acknowledge our joint contractual requirement to support this tasking and indicate a fundamental contradiction of your agreement under paragraph 1 of the [Flight/Phoenix subcontract] "to perform certain types and quantities of flight hours ... required by the Contract and described by separate Contract Line Item Numbers (CLIN)". It remains the Government's prerogative to assign CLINs for work to be performed. Moreover, our agreement is to divide work by CLIN assigned, not by unilateral interpretation of the nature of the work assigned.
>
> Continued reticence on the part of Phoenix Air to support this Contract requirement can only be viewed as a purposeful disruption of contract services to serve a parochial purpose. Accordingly, and on the advice of Counsel, we seek an acknowledgment within twenty-four (24) hours that Phoenix Air will support this exercise....

On June 24, 1998, Phoenix replied:

> Your letter of June 23, 1998 did not respond at all to the facts that work around Honolulu, Hawaii is defined as MIDPAC and that under the terms of our contract, Phoenix is entitled to 100% of the MIDPAC work at negotiated rates.
>
> Instead, you state, without any contract support, that the tasking and CLIN assignment "have been properly promulgated by the U.S. Government" and that it is "the Government's prerogative to assign

9. *See* 48 C.F.R. § 6.302–2 (1998).

CLINs for work to be performed". In fact, our agreement is to perform and divide work by type and location of work and not by some random assignment of CLINs without regard to specific definitions in the contract. The arbitrary assignments of CLIN by you results, quite simply, in performing this work at a loss.

\* \* \*

Phoenix Air is fully prepared to meet all of its contract obligations in accordance with the terms of the contract between us. We have the aircraft and the ability to fully comply with this MIDPAC exercise.

Phoenix also raised its concerns with the NAVAIR Program Manager in a June 14, 1998 letter:

We have been informed by Flight that you are directing that the upcoming Hawaii exercise be performed under East Coast and West Coast CLINs including excess hour CLINs. If true, we believe that determination to be directly contrary to the express terms of the contract. . . .

I further enclose a memorandum received from Flight setting forth the CLINs to be used and the split of the hours. Simply stated, to perform the work under these CLINs rather than the contractually required MIDPAC CLIN (which would be negotiated), results in this work being performed at a loss to Phoenix.

Thereafter, Phoenix filed a complaint in this court alleging that "[t]he government clearly and prejudicially violated and continues to violate 10 U.S.C. § 2304(a)(1)(A) [10] by its sole-source acquisition of training flight services in Hawaii and the Far East through the Flight Contract without any competition." Phoenix also contends that the sole-source acquisition violates 48 C.F.R. § 6.101(b) (1998) ("Contracting officers shall provide for full and open competition through use of the competitive procedure(s) contained in this subpart that are best suited to the circumstances of the contract action and consistent with the need to fulfill the Government's requirements efficiently (10 U.S.C. § 2304 and 41 U.S.C. § 253).").  Plaintiff claims that the government violated an obligation to treat Phoenix fairly and honestly with respect to procurement of the flight services for Hawaii and the Far East, and that, therefore, the award of the services to Flight should be set aside under the "arbitrary, capricious, abuse of discretion or otherwise not in accordance with law" standard of the Administrative Procedures Act, 5 U.S.C. §§ 701–06 (1994).  In addition to a demand for a permanent injunction, Phoenix's complaint included requests for a temporary restraining order and a preliminary injunction.

The day after the complaint was filed, oral argument was held on the requests for a temporary restraining order and a preliminary injunction, and, on the following day, the court denied those requests. While discovery proceeded on the request for a permanent injunction, Phoenix twice requested reconsideration of the denial of preliminary relief, and each time the court held oral argument and again denied plaintiff's requests.  In the interim, Modification 00019 activated CLIN 0226 to acquire training flight services in MIDPAC and WESTPAC for FY99. CLINs 0X35 and 0X37 were not employed.

After the considerable discovery difficulties referred to above, the parties finally were able to complete and file the administrative record.  The parties then filed cross motions for summary judgment.  Phoenix contends that "the defendant ignored specific requirements it is required to follow to add such optional work, which ensure that the procurement of the work is in the best inter-

_____

**10.** 10 U.S.C. § 2304(a)(1) (1994) reads as follows:

(a)(1) Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting a procurement for property or services—

(A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and

(B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

ests of the government." According to plaintiff, the government "failed to follow the regulatory requirements to exercise the option to extend the overall contract itself." Plaintiff argues:

> In the instant case, the defendant added MIDPAC and WESTPAC training flight services to the 2047 Contract through completely unrelated line items avoiding competition. To properly add these services, the defendant was required to make determinations that exercise of the option was the most advantageous method of fulfilling the government's need (price included). 48 C.F.R. § 17.207(c)(3). This was not done at all with respect to the MIDPAC and WESTPAC services.

The defendant, in turn, asserts, as an initial matter, that the court is without jurisdiction to entertain this dispute. The government states:

> Phoenix has not alleged that it has requested, through Flight, a Contracting Officer's final decision regarding the proper line item to be charged for work in Hawaii or the Far East. Until such a request is made and the Contracting Officer issues a final decision, Phoenix cannot bootstrap a contract dispute over which line items must be used into this Court using the bid protest jurisdiction.

The defendant recasts Phoenix's contentions and responds as follows:

> Phoenix is before this Court to urge that training flight services in Hawaii and the Far East must be ordered under cost-reimbursable line items denominated "MIDPAC" and "WESTPAC" when it provides work as a subcontractor in those regions, rather than using the existing, priced line items for aircraft flown from the East and West Coast designated bases, and assigning them on "Temporary Additional Duty" ("TAD").
>
> Unfortunately for Phoenix, the plain language of Contract 2047 completely undermines its claim: the contract's clear design is to support world-wide training; its scope of work includes the work performed in Hawaii and the Far East; it expressly grants the Navy the authority to ferry aircraft to Hawaii and the Far East; it contains explicit provisions for TAD at locations other than the home base of the aircraft; and it contains no proviso which binds the Navy to the outcome Phoenix suggests.

### DISCUSSION

The parties have filed cross motions seeking judgment on the administrative record, and RCFC 56.1 treats such motions as motions for summary judgment under RCFC 56(a). *Nickerson v. United States*, 35 Fed. Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255 (Fed. Cir.1997). Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that the moving party is entitled to judgment as a matter of law and that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lane Bryant, Inc. v. United States*, 35 F.3d 1570 (Fed.Cir. 1994). Summary judgment, however, will not be granted if "the dispute about a materi-

al fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is appropriate when the sole dispute concerns the interpretation of a government contract, a question of law. *See Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir. 1996).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Company v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed. Cir.1998); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985). In the case of parties making cross-motions for summary judgment, each motion must be judged independently and the court must view the evidence in the light most favorable to the other party. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

In the above-captioned case, the parties agree that summary judgment is appropriate and have filed affidavits, documents and joint stipulations of fact. Moreover, no material issues of disputed fact have been identified by the parties or the court. However, prior to examining the merits of the parties' motions for judgment on the administrative record, the court must first examine defendant's

contention that the court is without jurisdiction to adjudicate this dispute.

■ The jurisdiction of the United States Court of Federal Claims is set forth in the Tucker Act, as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . .

28 U.S.C.A. § 1491(a)(1) (West 1994 & Supp. 1998); *see also Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir. 1998); *IMCO, Inc. v. United States,* 97 F.3d 1422, 1425 (Fed.Cir.1996). The United States Court of Appeals for the Federal Circuit has stated that the Tucker Act's grant of jurisdiction "extends to suits brought by disappointed bidders, commonly called bid protests, challenging the proposed award of contracts based on alleged improprieties in the procurement process." *Southfork Sys., Inc. v. United States,* 141 F.3d at 1132 (quoting *Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1341 (Fed.Cir.1995)). In such cases, jurisdiction is based upon an alleged breach of "an implied contract to have the involved bids fairly and honestly considered." *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir. 1983) (in banc).

In 1997, Congress expanded the court's bid protest jurisdiction when the Administrative Dispute Resolution Act of 1996 went into effect. *See* Pub.L. No. 104–320, 110 Stat. 3870 (1996) (codified at 28 U.S.C.A. § 1491(b)); *CCL, Inc. v. United States,* 39 Fed.Cl. 780, 788 (1997); *see also Southfork Sys., Inc. v. United States,* 141 F.3d at 1132 n. 5. The Administrative Dispute Resolution Act added a new subsection (b) to § 1491 of the Tucker Act, which reads, in part:

(1) Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

\* \* \*

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

28 U.S.C.A. § 1491(b). Thus, pursuant to the jurisdiction vested in the Court of Federal Claims to hear both pre-award and post-award bid protests, this court can hold unlawful and set aside agency actions that it feels are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . ." as that standard is set forth in 5 U.S.C. § 706(2)(A) (1994). *Ramcor Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999); *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779 (1997).

In this case, defendant cites *Sharman Co., Inc. v. United States,* 2 F.3d 1564, 1568 (Fed.Cir.1993), *overruled on other grounds, Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed.Cir.1995), for the proposition that "[u]nder the [Contract Disputes Act], a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon." *See* 41 U.S.C.A. § 605(a) (West 1994 & Supp.1999).[11]

---

11. 41 U.S.C. § 605(a) requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be

Defendant argues that as a subcontractor Phoenix was required to request, through the prime contractor Flight, that the Contracting Officer make a final decision regarding the proper line item to be charged for work in Hawaii or the Far East. According to the government, "[u]ntil such a request is made and the Contracting Officer issues a final decision, Phoenix cannot bootstrap a contract dispute over which line items must be used into this Court using the bid protest jurisdiction."

Defendant, however, fails to recognize that plaintiff's claim before this court is not based upon the Contract Disputes Act, but rather the claim alleges a violation of § 2304 of the Armed Services Procurement Act (ASPA), 10 U.S.C.A. §§ 2302–2331 (West 1998 & Supp. 1999). Section 2304 was originally promulgated in 1984 in the Competition in Contracting Act (CICA), Pub.L. No. 98–369, 98 Stat. 1175 (codified as amended in scattered sections of 10, 31 and 41 U.S.C.).[12] As discussed in detail *infra*, under the CICA and the Armed Services Procurement Act, government agencies conducting procurements must "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; . . . ." 10 U.S.C.A. § 2304(a)(1)(A).

In this court, with respect to bid protests, the Tucker Act's jurisdictional requirements provide that the protesting plaintiff must be (1) an "interested party" (2) objecting to a solicitation or a proposed award, or alleging a "violation of statute or regulation in connection with a procurement or a proposed procurement." *See* 28 U.S.C.A. § 1491(b); *CCL, Inc. v. United States*, 39 Fed.Cl. at 789; *ATA Defense Indus., Inc. v. United States*, 38 Fed.Cl. 489, 494 (1997). With respect to the second of these jurisdictional requirements,

the United States Court of Appeals for the Federal Circuit has stated that "[t]he operative phrase 'in connection with' is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *Ramcor Servs. Group, Inc. v. United States*, 185 F.3d at 1289. Plaintiff's complaint in this case specifically alleges an ASPA violation, contending that "[t]he government clearly and prejudicially violated and continues to violate 10 U.S.C. § 2304(a)(1)(A) by its sole-source acquisition of training flight services in Hawaii and the Far East through the [2047 Contract] without any competition." This allegation is sufficient to satisfy the portion of the jurisdictional requirements relating to a "violation of statute or regulation."

Regarding Phoenix's status as an "interested party," that term is not specifically defined by 28 U.S.C. § 1491(b). This judge previously addressed the issue in *C C Distributors, Inc. v. United States*, 38 Fed.Cl. 771, 775–80 (1997). Cases in the Court of Federal Claims acknowledge the statutory definition of "interested party" used by the General Accounting Office (GAO) to determine its bid protest jurisdiction. *See, e.g., Cubic Defense Sys., Inc. v. United States*, 45 Fed.Cl. 239, 246–48, *appeal dismissed by parties*, No. 00–5010, 1999 WL 1289086 (Fed. Cir. Dec. 22, 1999); *CCL, Inc. v. United States*, 39 Fed.Cl. at 789. The GAO statute defines "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (1994). The cases in this court also have noted the differences between the statutes governing the bid protest jurisdiction of this court and of the GAO, and, thus, have treated the GAO definition as instructive, but not conclusive.

submitted to the contracting officer for a decision. . . . "

12. *See* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts*, ch. 1, § 1, at 25–26 (3d ed.1998):

Congress has not adopted one procurement statute for the entire Government. The two major statutes covering most Government procurement are the Armed Services Procurement Act (ASPA), 10 U.S.C. § 2302 et seq., and the

Federal Property and Administrative Services Act (FPASA), 41 U.S.C. § 251 et seq. The ASPA was passed in 1948, and FPASA, which was modeled after the ASPA, was enacted in 1949. Through the years, the ASPA was modified extensively, but the FPASA was not. Then, in 1984, through the Competition in Contracting Act (CICA), P.L. 98–369, Congress made these two statutes almost identical. . . .

*See, e.g., Winstar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 756 (1998) (looking to GAO statute's definition "for guidance"); *CCL, Inc. v. United States,* 39 Fed.Cl. at 789–90 (finding the "thrust" of the GAO definition relevant, but noting that it does not necessarily represent "the four corners of potential standing" under § 1491(b)); *Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 245 & n. 11 (1997) (employing the GAO statute's definition, but describing it as "narrower"), *aff'd,* 155 F.3d 566 (Fed.Cir.1998); *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. at 494 (stating that "[t]he definition of 'interested party' in Section 3551(2) arguably is more narrow than the definition that would flow from the application of the plain meaning of Section 1491(b).").

The fact that a concrete definition for "interested party" under the Tucker Act has yet precisely to be delineated is not critical for this case, as the court finds that Phoenix would be an "interested party" under either the plain meaning of the phrase in the Tucker Act or under the GAO statutory definition. Phoenix would satisfy the GAO statute's definition because it was and is a "prospective bidder." This is apparent from the fact that Phoenix submitted a proposal in response to the subsequently-canceled RFP F296001–98–R–0014, in which the Air Force attempted to expeditiously procure training flight services for the RIMPAC exercise using the urgent and compelling exception to the CICA. Furthermore, Phoenix, as a subcontractor under particular line items of the 2047 Contract, is responsible for some government orders of flight services for the MIDPAC and WESTPAC regions. The government has not argued that Phoenix would be incapable of

bidding for and performing work in those regions if a new solicitation for such work were to be announced.[13]

For similar reasons, Phoenix would be an "interested party" under the arguably broader scope of the Tucker Act.[14] Without an explicit definition, previous Court of Federal Claims decisions have found that, to be an "interested party" under the Tucker Act, a "plaintiff must stand in some connection to the procurement, and it must have an economic interest in it." *CCL, Inc. v. United States,* 39 Fed.Cl. at 790; *accord Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. at 247. As noted above, Phoenix's connection to the "procurement" is its readiness and ability to bid for work which plaintiff argues should be competitively procured by the Air Force. Phoenix's economic interest is the revenue which it might gain if it were to perform the work under a different contract.

With the court holding that Phoenix is an interested party, and with Phoenix alleging a violation of a statute—the Armed Services Procurement Act—in connection with a procurement, the court has standing to hear this dispute under the requirements set forth in the Tucker Act, 28 U.S.C. § 1491(b). In *CCL, Inc. v. United States,* the court stated that:

> The new bid-protest statute authorizes this court to entertain "an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement...." 28 U.S.C.A. § 1491(b)(1) (West Supp. 1997).... The fact that the balance of the new bid-protest statute also permits actions challenging "solicitations for bids or proposals for a proposed contract or to the award or the proposed award of a con-

---

**13.** Phoenix would also satisfy the definitional requirement of the GAO statute that its "direct economic interest would be affected by the award of the contract or by failure to award the contract," as a contract for training flight services in the MIDPAC and WESTPAC regions could be a source of revenue for a service provider such as Phoenix who has the capability to perform the work.

**14.** See *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. at 494, in which the Court of Federal Claims stated:

> The definition of "interested party" in Section 3551(2) [the GAO statute] arguably is more narrow than the definition that would flow from the application of the plain meaning of Section 1491(b). A party reasonably could be deemed to be interested in the award of a contract even if the party is not an actual or prospective bidder. For example, a subcontractor of a bidder on a contract would have an economic interest in the contract award and therefore would be an "interested party" even though the subcontractor is neither an actual nor prospective bidder.

tract" is irrelevant. The new language permits both a suit challenging government action which is self-consciously a competitive procurement as well as what [plaintiff] is claiming here: that [defendant] is procuring goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is in violation of law. The statute is therefore plainly invoked. Accordingly, defendant's motion to dismiss for lack of jurisdiction must be denied.

39 Fed.Cl. at 789 (footnote omitted).

Having established that the exercise of jurisdiction is proper in the above-captioned case, the court now examines the merits of the parties' cross motions for judgment on the administrative record. The dispute in this case centers around the government's procurement of training flight services for the Navy's RIMPAC 98 training exercise and for fiscal year 1999 in the MIDPAC and WESTPAC regions. According to the plaintiff, "the defendant added MIDPAC and WESTPAC training flight services to the 2047 Contract through completely unrelated line items avoiding competition." Plaintiff claims that this was a violation of the ASPA, 10 U.S.C.A. § 2304(a)(1)(A), and that the procurement should be set aside. The defendant counters that the task order issued for work in Hawaii and the Far East is within the scope of the 2047 Contract, and cites section 2304c(d) of the ASPA for the proposition that "[p]rotests are not authorized against the issuance or proposed issuance of a task order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is placed." *See* 10 U.S.C.A. § 2304c(d) (West 1998). According to the government:

[T]he plain language of Contract 2047 completely undermines [Phoenix's] claim: the contract's clear design is to support worldwide training; its scope of work includes the work performed in Hawaii and the Far East; it expressly grants the Navy the authority to ferry aircraft to Hawaii and the Far East; it contains explicit provisions for TAD [Temporary Additional Duty] at locations other than the home base of the aircraft; and it contains no proviso which binds the Navy to the outcome Phoenix suggests.

The Competition in Contracting Act of 1984 (CICA) "seeks to make government contracting more efficient and rests on a commitment, where practicable, to bring the benefits of competition to government procurement." *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. at 498. It was enacted, in part, because of congressional concern that federal agencies were overpaying for products and services. *See id.* at 499. The CICA "compels the promulgation of regulations and procedures to ensure full and open competition," *Krygoski Constr. Co., Inc. v. United States,* 94 F.3d 1537, 1542 (Fed.Cir. 1996), *cert. denied,* 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997), and it was designed to increase competition in government contracting and to impose more stringent restrictions on the awarding of noncompetitive, sole-source contracts, *SMS Data Prods. Group, Inc. v. United States,* 853 F.2d 1547, 1554 (Fed.Cir.1988) (citing H.R. Conf. Rep. No. 98–861, at 1421 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697, 1445, 2109). To achieve the benefits of competition in government procurement, the CICA, through section 2304 of the Armed Services Procurement Act, requires that:

[T]he head of an agency in conducting a procurement for property or services—

(A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and

(B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

10 U.S.C.A. § 2304; *see ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. at 499–500.

With respect to the deference which is accorded to agency decisions under the CICA, the court in *ATA* stated:

Application of the CICA anticipates that prior to entering a contract, an agency will make a reasoned determination as to which

procedures, competitive or otherwise, would best serve the needs of the agency. If an agency attempts such a reasoned determination and acts consistent with that determination, then the agency is granted extensive deference. An agency's actions are overturned only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

*Id.* at 498.

■ Certain contract modifications must be competed, or other potential bidders are prevented from competing for what is essentially a new and different contract. *CCL, Inc. v. United States,* 39 Fed.Cl. at 791. It is important to note, however, that the United States Court of Appeals for the Federal Circuit has indicated that the CICA does not require a new bid procedure for every change made to an existing contract. *See AT & T Communications, Inc. v. WilTel, Inc.,* 1 F.3d 1201, 1205 (Fed.Cir.1993). "Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement." *Id.* When enacting the legislation, Congress did not intend to prevent contract modifications in appropriate circumstances. *See id.* at 1205 n. 1. According to the Federal Circuit:

In determining whether a modification falls within CICA's competition requirement, this court examines whether the contract as modified materially departs from the scope of the original procurement.... The analysis thus focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified. Thus a broad original competition

may validate a broader range of later modifications without further bid procedures.

*Id.* at 1205 (citations omitted).[15] The inquiry with respect to scope is an objective one viewed from the perspective of potential bidders for the original procurement. *See id.; CCL, Inc. v. United States,* 39 Fed.Cl. at 791.[16]

■ In the case at bar, the government contends that all purchased training flight services for Hawaii and the Far East were within the scope of the 2047 Contract. The defendant outlines its position as follows:

Contract 2047 explicitly provides the Government with two alternatives for obtaining services in Hawaii and the Far East. Under the first alternative, the Contracting Officer can order the contractor to take planes from the East and West Coast designated bases and fly missions at other locations....

Under the second alternative, the Contracting Officer can direct the contractor to establish other permanent bases. Paragraphs C–15 and C–1d of Contract 2047 provide for site activation of bases at certain locations, including MIDPAC (Hawaii) and WESTPAC (Japan)....

The Government in this case has chosen the first alternative, *i.e.,* to order services provided by aircraft based on the East and West Coast, and have them detached to Hawaii and the Far East for temporary, short-term training exercises. As shown above, no modification of Contract 2047 was necessary for this to occur. Contract 2047 explicitly permits the Navy to task for work at other locations by sending

**15.** The court in *AT & T Communications, Inc. v. WilTel, Inc.* noted that the United States Court of Claims had previously used the "cardinal change" doctrine to determine whether a contract modification is within the scope of an underlying contract. 1 F.3d at 1205 (citing *Allied Materials & Equip. Co. v. United States,* 215 Ct. Cl. 406, 569 F.2d 562, 563–64 (1978)). The court also noted, however, that the question which it had to examine was "slightly different from the cases which produced this cardinal change doctrine." *Id.* The court stated:

This case does not ask whether Government modifications breached a contract, but asks instead whether Government modifications

changed the contract enough to circumvent the statutory requirement of competition. The cardinal change doctrine asks whether a modification exceeds the scope of the contract's changes clause; this case asks whether the modification is within the scope of the competition conducted to achieve the original contract.

*Id.*

**16.** In addition, when a contracting officer chooses between modifying and terminating a contract, the "ease of administration" concern imparts a bias in favor of modification. *Krygoski Constr. Co., Inc. v. United States,* 94 F.3d at 1544.

planes on TAD, rather than by permanently basing planes in these locations. . . .

Defendant claims that the order for work in Hawaii and the Far East was a task order within the scope of the 2047 Contract. The Federal Acquisition Regulation (FAR) defines a "task order" as "an order for services placed against an established contract or with Government sources." 48 C.F.R. § 2.101 (1998). The ASPA defines "task order contract" under 10 U.S.C.A. § 2304d(1) (West 1998) as "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." An identical definition is found in 48 C.F.R. § 16.501–1 (1998). An examination of the 2047 Contract confirms that it is an indefinite-delivery/indefinite-quantity contract which includes three types of contract line items: (1) indefinite-delivery/indefinite-quantity CLINs, (2) requirements CLINs and (3) cost-reimbursable CLINs. The contract specifically states in Section F–2, labeled "Place of Performance," and in Section F–4, labeled "Place of Delivery," that the services to be furnished shall be delivered or performed in accordance with orders issued by the Procuring Contracting Officer consistent with the Scope of Work detailed in the contract.

For a contract of this type involving the use of task orders, defendant notes that ASPA § 2304c(d) limits the challenges which can be made to a contracting officer's decisions. *See* 10 U.S.C.A. § 2304c(d). That section states: "A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." *Id.* This standard would be applicable to determining whether the government's actions were proper for the procurement of flight services for the RIMPAC exercise, because the Contracting Officer for the 2047 Contract issued Task Order 0079 in partial support of the RIMPAC 1998 exercise. The necessary commercial flight services for RIMPAC were ordered in Task Order 0079

under existing priced East Coast CLINs 0103AB, 0104AB, and 0107AB, and West Coast CLINs 0122AB and 0123AB. Aircraft ferrying was accomplished via East Coast special ferry CLIN 0119 and West Coast special ferry CLIN 0133.

However, Phoenix's challenge to the government's actions with respect to FY99 centers not on a task order, but on a modification to the 2047 Contract. That October 21, 1998 modification, numbered P00019, activated a previously inactive CLIN, 0226, and established a unit price of $1800 per flight hour. The question of whether competition was necessary for Modification 00019 must be judged under the standard articulated in cases such as *AT & T Communications, Inc. v. WilTel, Inc.*, which states that "only modifications outside the scope of the original competed contract fall under the statutory competition requirement." 1 F.3d at 1205.

Thus, in accordance with the ASPA § 2304c(d) standard and the law announced by the Federal Circuit in *AT & T Communications, Inc. v. WilTel, Inc.*, the government's contested procurements in this case must be examined with an eye toward the scope of the 2047 Contract. This court finds that the procurements at issue here, the acquisitions of training flight services in the MIDPAC and WESTPAC regions for the RIMPAC exercise and FY99, are within the scope of the 2047 Contract. Subsection (c.) of the Scope of Contract section explicitly states that the contract's "majority of services will be required in the Continental U.S. (East and West Coast), Hawaii (MIDPAC), and the Far East (WESTPAC)." That subsection continues by noting that operations are normally conducted in certain listed areas of the continental United States, Puerto Rico, Hawaii and Japan, but the contract then specifically clarifies that "missions are not limited to these areas and operations may be required anywhere worldwide." The contract's broad scope, covering training flight services for the Navy across the globe, is also confirmed by subsection (b.) of the Scope of Contract section, which states that the aircraft providing the training flight services "will be required to perform operational services in support of the U.S. Navy, [De-

partment of Defense], and other Government programs worldwide," and by subsection (a.), which notes that "the purpose of this solicitation and any resultant contract is to obtain the services of aircraft, which are properly equipped, maintained, fueled, and operated by qualified contractor personnel, for use in a wide range of United States (U.S.) Government Commercial Air Services programs."

For the RIMPAC 98 exercise, the Contracting Officer issued Task Order 0079 under the 2047 Contract, which employed existing priced East Coast CLINs 0103AB, 0104AB, and 0107AB and West Coast CLINs 0122AB and 0123AB to acquire the needed training flight services in the Hawaii area.[17] Because the contract contemplated the performance of commercial air services in the MIDPAC/Hawaii area, the Task Order was not outside the contract's scope, and, under ASPA § 2304c(d), Phoenix is not in a position to successfully protest the Task Order.[18] Similarly, for FY99, Modification 00019 activated CLIN 0226 to acquire training flight services in MIDPAC and WESTPAC. As noted above, procurement of such services through the 2047 Contract was contemplated by the contract's Scope of Contract section, both for these areas and for the rest of the world. Because "only modifications outside the scope of the original competed contract fall under the statutory competition requirement," *AT & T Communications, Inc. v. WilTel, Inc.*, 1 F.3d at 1205, Modification 00019 did not violate ASPA § 2304 and the government was not required to separately compete the MIDPAC and WESTPAC work. This conclusion is further supported by the Federal Circuit's statement in *AT & T Communications, Inc. v. WilTel, Inc.* that "a broad original competition may validate a broader range of later modifications without further bid procedures." *Id.*

Apart from issue of scope, Phoenix contends that the government violated the ASPA competition requirements by not providing the proper justification required by the Federal Acquisition Regulation for the exercise of options. According to 48 C.F.R. § 17.207(c) (1998):

The contracting officer may exercise options only after determining that—

(1) Funds are available;

(2) The requirement covered by the option fulfills an existing Government need;

(3) The exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors (see paragraphs (d) and (e) below) considered; and

(4) The option was synopsized in accordance with part 5 unless exempted by 5.202(a)(10) or other appropriate exemptions in 5.202.

Other pertinent subsections of § 17.207 read as follows:

(d) The contracting officer, after considering price and other factors, shall make the determination on the basis of one of the following:

(1) A new solicitation fails to produce a better price or a more advantageous offer than that offered by the option. If it is anticipated that the best price available is the option price or that this is the more advantageous offer, the contracting officer should not use this method of testing the market.

(2) An informal analysis of prices or an examination of the market indicates that the option price is better than prices available in the market or that the option is the more advantageous offer.

(3) The time between the award of the contract containing the option and the exercise of the option is so short that it indicates the option price is the lowest price obtainable or the more advantageous offer. The contracting officer shall take into consideration such factors as market stability and comparison of the time since

17. Also, two other CLINs were used to acquire the ferrying of aircraft to Hawaii: CLIN 0119 for moving aircraft from the East Coast designated base in Virginia and CLIN 0133 to move aircraft from the West Coast designated base in California.

18. The court notes that plaintiff does not claim that the Task Order increased the period or maximum value of the 2047 Contract, which are additional grounds upon which a protest might be authorized under 10 U.S.C.A. § 2304c(d).

award with the usual duration of contracts for such supplies or services.

(e) The determination of other factors under (c)(3) of this section should take into account the Government's need for continuity of operations and potential costs of disrupting operations.

(f) Before exercising an option, the contracting officer shall make a written determination for the contract file that exercise is in accordance with the terms of the option, the requirements of this section, and part 6. To satisfy requirements of part 6 regarding full and open competition, the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract. . . .

48 C.F.R. § 17.207.

Toward the end of its "Motion and Memorandum in Support of Motion for Judgment on the Basis of the Administrative Record," the plaintiff argues that all of the services under the 2047 Contract "should be subject to competition immediately" because "this is the second option year of a contract that was awarded to the highest of the two offerors. In order to exercise this option, the contracting officer should have, at a minimum, performed some pricing analysis or market examination. No analysis was performed or explanation provided." Under § 17.207(c), the contracting officer needs to show that the "exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors ... considered," and under § 17.207(f), that determination must be in writing for the contract file.

In the case of the 2047 Contract, however, the contracting officer did provide the written justification as required under 48 C.F.R. § 17.207. The administrative record in this case contains the "Contracting Officer's Determination for the Exercise of Option Year II" for the 2047 Contract, covering the period of October 1, 1998 through September 30, 1999. In relevant part, the contracting officer stated that:

*Option:* Exercise of this option is the most advantageous method of fulfilling the Government's needs. Factors considered in making this determination were the Government's need for continuity of operations, the option price, the potential costs to the Government for disrupting operations and satisfactory performance by the incumbent contractor; i.e.:

(1) *Price:* This procurement, consisting of a base and four option years, was awarded under full and open competition. The option years were evaluated at the time of award and determined to be fair and reasonable based on competition.

(2) *Performance:* The Contractor's present performance demonstrates responsiveness to the Government's needs. The requiring activity is satisfied with Contractor performance and recommends the exercise of Option II. The Contractor is found to be responsible within the parameters of FAR 9.104–1.

(3) *Continuity of Operations:* By exercising Option II, there will be a considerable cost savings to the Government due to the continuity of operations and savings in administrative costs by not recompeting at this time. The time element required to solicit a new procurement is prohibitive and would result in a costly disruption of operations as well. Exercise of Option II is in accordance with FAR 52.217–9 and the requirements of FAR 17.207. All options offered were evaluated as part of the initial award and are exercised at the amount specified in the terms of the contract; renegotiation of option pricing is not required.

█ Therefore, the contracting officer adequately demonstrated and explained her rationale as to why it would be most advantageous for the government to exercise the second option year. Her decision indicates that she appropriately considered such factors as price, timing, government need, and any potential disruption to operations. As defendant notes, "[a]ll of the ultimate findings required by FAR 17.207(e) are recited in the Contracting Officer's determination. There is no requirement in FAR 17.207(e) that each and every subfinding be documented." Furthermore, it is established law that public officers are entitled to a "presumption of regularity" when conducting government

business, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *Chas. H. Tompkins Co. v. United States,* 43 Fed.Cl. 716, 719 (1999), including administrators of the military, *Gruendyke v. United States,* 226 Ct.Cl. 193, 639 F.2d 745, 747 (1981).

■ Plaintiff in this case also devotes significant space and effort to arguing that the government improperly used particular East and West Coast CLINs to acquire services for the RIMPAC exercise and FY99 requirements for the MIDPAC and WESTPAC regions. Phoenix contends that commercial air services for Hawaii and Japan should have been ordered by way of CLINs 0X35 and 0X37. CLINs 0X35 and 0X37 both read "JET AIC, TRACK, FERRY, UTILITY, TOW MISSIONS, BASIC GFE/CFE, EW Missions (Lear 36)," and are listed under "PART F—COST REIMBURSABLE— MIDPAC/WESTPAC" of "SECTION B— SUPPLIES OR SERVICES AND PRICES/ COSTS" of the 2047 Contract.[19] CLIN 0X35 appears under the column heading "MID-PAC," and CLIN 0X37 appears under the column heading "WESTPAC."

For the RIMPAC exercise in Hawaii, the government did not order commercial air services under the MIDPAC CLIN 0X35, but rather the necessary services were ordered in Task Order 0079 under the existing priced East Coast CLINs 0103AB, 0104AB, and 0107AB and West Coast CLINs 0122AB and 0123AB. Aircraft ferrying was procured via East Coast special ferry CLIN 0119 for moving aircraft from the East Coast designated base in Virginia to Hawaii. In order to move aircraft from the West Coast designated base in California to Hawaii, West Coast special ferry CLIN 0133 was employed. Similarly, for FY99, Modification 00019 activated CLIN 0226 to acquire training flight services in MIDPAC and WESTPAC, and CLINs 0X35 and 0X37 were not employed. Phoenix contends that it is improper for the government to use East Coast and West Coast line items for Hawaii (MIDPAC) and Far East (WEST-PAC) services when there are contract line

items included in the 2047 Contract for those areas. Defendant argues that CLINs 0X35 and 0X37 are only to be used if the government decides to activate a particular launching site in either the MIDPAC region or WESTPAC region, respectively. Phoenix asserts that no site activation is necessary.

Plaintiff's disagreement with the contracting officer's use of certain CLINs, however, addresses a matter of contract administration and decisions made by the contracting officer. As discussed above, the court's jurisdiction to decide competition issues in this case springs from the bid protest jurisdiction of the Tucker Act and is based upon plaintiff's contention that the government's activities violated a legal requirement to competitively procure commercial air services. To appropriately address an alternative issue of allegedly improper contract administration, this court would have to examine a contracting officer's final decision on a properly certified contractor's claim, in accordance with the requirements of the Contract Disputes Act. No such claim has been presented in the present case, nor could plaintiff Phoenix present such a claim to the contracting officer as Phoenix is not the prime contractor for the 2047 Contract and, therefore, lacks privity with the government. Thus, the court has no jurisdiction to evaluate Phoenix's criticism of the contracting officer's use of particular contract line item numbers.

Moreover, regardless of the jurisdictional obstacle, plaintiff's position is not supported by the administrative record or the 2047 Contract. Plaintiff bases its argument that no site activation is necessary on the fact that there are certain expressly-identified CLINs in the 2047 Contract which are only used when a site is activated. Plaintiff quotes the contract schedule, which states that "CLINs 0X09, 0X10, 0X11, 0X14, 0X15 and 0X17 will be utilized only when or if a site is activated at the location specified in each CLIN." Because contract line item number 0X35 and line item number 0X37 are not among the line item numbers listed, Phoenix contends that the legal principle of

---

19. The same CLINs are repeated for the base year and the four option years, but renumbered accordingly (i.e., 0035 and 0037 for the base year, 0135 and 0137 for option year 1, 0235 and 0237 for option year two, etc.)

"expressio unius est exclusio alterius" indicates that site-activation was not a prerequisite for the use of 0X35 and 0X37.[20]

Phoenix's reliance on the "expressio unius" principle, however, is misguided. The sentence which plaintiff quotes addresses only particular "requirements" CLINs, and it appears in a contract schedule subsection with the header **"B. REQUIREMENTS CLINS."** The CLINs at issue in this case, 0X35 and 0X37, as noted above, are "cost-reimbursable" CLINs. This is clearly set forth in contract schedule subsection C, entitled **"COST–REIMBURSABLE CLINS."** The first sentence of that subsection reads, "CLINs 0X19, 0X20, 0X24 thru 0X37, and 0X41 thru 0X48 are COST REIMBURSABLE line items." Thus, the plaintiff's quoted sentence from subsection B may be seen as possibly excluding other requirements CLINs from a list of requirements CLINs requiring site-activation prior to utilization. The sentence has no significance with respect to cost-reimbursable line items, and, therefore, is not relevant to CLINs 0X35 and 0X37.

Plaintiff also attempts to persuade the court that both the NAVAIR Program Manager and CINCPACFLT believed that MIDPAC and WESTPAC work had to be ordered under CLINs 0X35 and 0X37. Regarding NAVAIR, Phoenix points to a June 5, 1998 e-mail from Teri Boswell, an analyst with the NAVAIR Program Manager, which states in regards to the 2047 Contract that "[a]dditional line items are contained in the contract for the MIDPAC/WESTPAC/PACNORWEST Areas which are reimbursable and are not funded and if needed can be negotiated." This statement, however, does not support plaintiff's contention that any such CLINs had to be employed to order services for those areas. Rather, the statement is consistent with the government's argument that the cost-reimbursable CLINs existed, and could be activated if the contracting officer chose to activate particular sites.

With respect to CINCPACFLT, plaintiff relies chiefly on statements made by Gary Phenning, who has been the official CINC-

PACFLT representative in the United States for airborne threat simulation for the past four years. Phoenix notes Mr. Phenning's statement that in May, 1998, he believed that commercial air services for MIDPAC and WESTPAC had to be ordered via CLINs 0X35 and 0X37, respectively. Even so, as defendant notes, Mr. Phenning has no responsibility for the administration of the 2047 Contract. Furthermore, the parties have stipulated that he had no part in preparing the solicitation for the 2047 Contract, and that he similarly had no part in negotiating or awarding the contract.

In addition, CINCPACFLT recognized prior to this litigation, in various communications, that services could be obtained for the MIDPAC and WESTPAC regions under the 2047 Contract by temporarily using aircraft based on the east and west coasts and ordering services through line items for the aircraft's home base. For example, in June, 1998, CINCPACFLT stated that "RIMPAC requirements, with the exception of ferry hours, may be supported from existing, activated line items." Later in the month, on June 16, 1998, CINCPACFLT expressed the following opinion:

2. CINCPACFLT anticipates that for the remainder of FY98 and for all of FY99, contracted flight services (CFS) requirements, with the exception of tactical aircraft support (F–4, etc.), will be provided through the PMA–207 air services contract. . . .

3. Following action requested:

A. For PMA–207, determine ferry cost for Lear [jet] support in PACNORWEST, MIDPAC, WESTPAC. . . . Intention is to support MIDPAC/WESTPAC/PACNORWEST requirements with quarterly scheduled deployments of two aircraft. Deployments estimated to last up to 45 days for MIDPAC/WESTPAC and 21 days for PACNORWEST. Deployments may be concurrent. With the exception of ferry hours, intend to fund requirement under existing, activated line items. . . .

Still later, on July 14, 1998, as part of a letter to the NAVAIR Program Manager,

---

**20.** According to Black's Law Dictionary 602 (7th ed. 1999), "expressio unius est exclusio alterius" is "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative."

CINCPACFLT's Director for Operations expressed his preference for funding FY99 requirements through existing, activated East and West Coast CLINs. He stated:

> I believe that the most economical way to satisfy these requirements is through activation of ferry line items on the existing [2047 contract] and purchase of the flight hours from existing/activated line items (at excess rates). This is similar to the arrangement made to support RIMPAC. We understand that this puts an additional burden on the Fleet to "deconflict" deployments of aircraft—but believe it is possible with cooperation and flexibility from all concerned.

Thus, it appears that CINCPACFLT, the prime customer for services under the 2047 Contract, recognized that activation of CLINs 0X35 and 0X37 was not necessary to purchase flight services in Hawaii and the Far East. The contracting officer's use of existing, activated East and West Coast CLINs was within the contracting officer's discretion, and the decision to use those CLINs was a reasonable exercise of the contracting officer's contract management responsibilities.

### CONCLUSION

After thoroughly reviewing the record and carefully considering the arguments, the court holds that the government's procurement of commercial air services in the MID-PAC and WESTPAC regions for the 1998 RIMPAC exercise and for fiscal year 1999 were within the scope of the competitively awarded 2047 Contract. Accordingly, there has been no violation of the Armed Services Procurement Act or the Competition in Contracting Act. The court, therefore, **GRANTS** defendant's motion for summary judgment upon the administrative record. The court **DENIES** the plaintiff's motion for summary judgment upon the administrative record and **DENIES** the plaintiff's request for a permanent injunction. Each party shall bear their own costs.

**IT IS SO ORDERED**.