**ALASKA CENTRAL EXPRESS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Northern Air Cargo, Inc., Intervenor.**

**No. 01–401C.**

United States Court of Federal Claims.

Oct. 19, 2001.

---

Robert P. Silverberg, Washington, DC, for plaintiff.

F. Jefferson Hughes, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Michael Mumbach, United States Postal Service, of counsel.

Scott T. Kragie, Washington, DC, for intervenor.

## *OPINION*

MILLER, Judge.

This case is before the court after argument on defendant's motion to dismiss. The issue for decision is whether plaintiff is an "interested party" within the meaning of 28 U.S.C. § 1491(b)(1) (1994 & Supp. V 1999).

## FACTS

The following undisputed facts are drawn from the complaint and the filings beyond the complaint. The mail distribution system in Alaska is unique. Because of the state's geography and climate, almost all mail cargo shipments in the interior are transported by air through private carriers. The Department of Transportation (the "DOT") establishes the rates to be paid to these carriers by the United States Postal Service (the "USPS") for the transportation of mail in Alaska. 49 U.S.C. § 41901(b) (1994); 39 U.S.C. § 5402(f) (1994 & Supp. V 1999). Pertinent to this case are two of these rate classes, mainline and bush, which are based on the costs associated with the size of the aircraft operated by the carrier. The mainline class includes aircraft having a maximum gross payload exceeding 7,500 pounds; and the bush class is designated for aircraft having a payload capacity up to and including 7,500 pounds. Because the mainline rate is lower than the bush rate, the USPS will usually distribute mail to mainline carriers on the routes served by those carriers.

In order to allow bush carriers to obtain an equitable distribution of the mail on routes served by mainline carriers, bush carriers can opt to accept a rate equal to the lower mainline rate through a process called "equalization." Generally, any carrier utilizing bush aircraft, such as Alaska Central Express, Inc. ("plaintiff"), may "equalize" by filing with the DOT a notice of intent to accept the lower mainline rate of pay and providing written notice to the USPS and each carrier providing service on the particular route. The USPS then determines whether to utilize equalized service after performing a review to determine the service benefits and cost impacts associated with the proposed change.

In addition to the system described above, the USPS is also subject to rules specifically governing the transportation of nonpriority bypass mail in Alaska. Nonpriority mail is mail other than express mail, priority mail, or first-class mail. Bypass mail is bulk standard mail that is prepared so as not to require handling in a postal facility; it alleviates congestion in the USPS processing centers by "bypassing" them. In 1995 Congress required that carriers of nonpriority bypass mail in Alaska shall

> have provided scheduled service within the State of Alaska for at least 12 consecutive months with aircraft—
>> (i) up to 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at an applicable intra-Alaska bush service mail rate; and
>> (ii) over 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at the intra-Alaska mainline service mail rate.

39 U.S.C. § 5402(g)(1)(D).

Plaintiff is a small Alaskan airline that since 1989 has carried mail for the USPS in Alaska. Plaintiff has a small fleet of propeller-driven aircraft, ten of which have a payload capacity under 7,500 pounds, and one of which has a payload capacity greater than 7,500 pounds. Plaintiff has provided scheduled service within Alaska for one or more years with each of these aircraft. Transportation of nonpriority bypass mail on mainline routes accounts for the majority of plaintiff's annual revenues.

Plaintiff's understanding is that the equalization rate—the rate at which a bush carrier is paid for carrying mail that otherwise would have been distributed to mainline carriers—is a bush rate, albeit at a lower level, and that plaintiff accordingly is eligible to carry mainline nonpriority bypass mail under the requirements of section 5402(g)(1)(D)(i), because it had provided scheduled service for a year with a payload capacity up to 7,500 pounds.[1] Until this year the USPS appeared to share this interpretation. Since 1996 plaintiff has carried nonpriority bypass mail to small outlying Alaskan towns for the USPS at bush rates and between major cities in Alaska at the equalization rate.

On June 25, 2001, the USPS determined that plaintiff was ineligible to receive tender of mainline nonpriority bypass mail under the terms of section 5402(g)(1)(D). The USPS reasoned that the equalization rate is, in fact, the mainline rate and that plaintiff was therefore required to have operated aircraft with a payload capacity over 7,500 pounds for one year. Based on this interpretation, the USPS determined that plaintiff was ineligible to transport mainline nonpriority bypass mail at the equalization rate.

Plaintiff filed its complaint in the Court of Federal Claims seeking a declaration that its termination is contrary to law, an injunction reinstating it as an intra-Alaskan air carrier of mainline nonpriority bypass mail, damages for lost revenues, costs, and attorneys' fees. The parties subsequently agreed to maintain the status quo during the pendency of this action, and the USPS has continued to tender all categories of bush and mainline mail to plaintiff, thus rendering plaintiff's claim for lost revenues moot.[2] The court granted the motion of Northern Air Cargo, Inc. ("intervenor"), to intervene.

---

1. Plaintiff also argues that it in fact provided scheduled service for over a year with one aircraft having a payload capacity in excess of 7,500 pounds.

2. This agreement was memorialized in the court's order of July 17, 2001.

## DISCUSSION

The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). At the pleading stage, general factual allegations may suffice to meet this burden, for on a motion to dismiss the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). However, because proper jurisdiction is not merely a pleading requirement, "but rather an indispensable part of the plaintiff's case, each element [of subject matter jurisdiction] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 883–89, 110 S.Ct. 3177; *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114–15 & n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 526–27 & n. 6, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (Brennan, J., dissenting)). Therefore, as the party invoking federal jurisdiction in this action, plaintiff bears the burden of pleading the facts upon which the court's jurisdiction depends. *See McNutt*, 298 U.S. at 189, 56 S.Ct. 780. Moreover, on a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court may consider all relevant evidence in order to resolve a factual dispute, including evidentiary matters outside the pleadings. *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed.Cir.1985).

Plaintiff's complaint alleges that the Tucker Act, 28 U.S.C. § 1491 (1994 & Supp. V 1999), provides two bases for jurisdiction: sections 1491(a)(1) and 1491(b)(1). Under section 1491(a)(1), the Court of Federal Claims is authorized to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

This jurisdiction extends only to claims for money damages and must be strictly construed. *United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Moreover, while conferring jurisdiction, section 1491(a)(1) does not create a substantive right enforceable against the United States for monetary damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Testan*, 424 U.S. at 398, 96 S.Ct. 948. "Instead, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, constitutional provision, statute, or regulation that provides a substantive right to money damages." *Khan v. United States*, 201 F.3d 1375, 1377 (Fed.Cir.2000). The complaint, however, does not allege the existence of an express or implied contract with the United States, or the violation of a money-mandating statute or regulation.

Under section 1491(b)(1), the Court of Federal Claims has jurisdiction

to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

Section 1491(b) does not specifically define the term "interested party." In *AFGE v. United States*, 258 F.3d 1294, 1302 (Fed.Cir. 2001), the Federal Circuit interpreted "interested party" as "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."

### 1. *Existence of a contract*

Defendant and intervenor make two arguments as to why plaintiff is not an interested

party. First, they argue that no contract is at issue in this case.

The unique structure at issue here, where [plaintiff] informs the Postal Service of its status as an equalized carrier, and is then, in accordance with the statute, provided an equitable share of the mail for reimbursement at a rate fixed by the Department of Transportation, does not fit the elements of an implied-in-fact contract. No negotiation or "meeting of the minds" takes place—as nothing needs to be determined or agreed upon—and no consideration is furnished by the Postal Service, which merely fulfills its pre-existing legal duty to provide an equitable share of the mail for that route.

Def.'s Br. filed Sept. 17, 2001, at 16–17; *accord* Intv.'s Br. filed Sept. 18, 2001, at 1. Defendant and intervenor further rely on 39 U.S.C. §§ 5402(d) and (f). Section 5402(d) provides: "The Postal Service may determine rates and contract with any air carrier for the transportation of mail by aircraft in interstate air transportation either through negotiations or competitive bidding." On the other hand, section 5402(f) provides that this authority "shall not apply[ ] to the transportation of mail by aircraft between any two points both of which are within the State of Alaska." Defendant and intervenor argue that subsection (d) expressly grants the USPS authority to contract and that subsection (f) expressly removes this authority.

■ The court has no difficulty concluding that a contract is the subject of this lawsuit. "The general requirements for a binding contract with the United States are identical for both express and implied contracts." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). To establish a contract with the Government, plaintiff must show (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) actual authority of the Government representative whose conduct is relied upon to bind the Government in contract. *Lewis v. United States*, 70 F.3d 597, 600 (Fed.Cir.1995).

■ Defendant and intervenor argue that no mutuality of intent to contract—no meeting of the minds—can be found because no negotiation has taken place. With public contracts, however, it is not unusual that terms are fixed by statute and removed from the bargaining table. The fact that Alaskan air carriers must transport mail when required by the Government, 49 U.S.C. § 41903(a) (1994), and must do so at the rates set by the DOT, does not detract from their intent to provide a service to the Government in return for payment. Likewise, the fact that the USPS has no discretion to alter the rate of compensation or deny is irrelevant to the question of its intent to make payment to carriers in return for their transportation of the mail.

Defendant and intervenor also misconstrue section 5402. Section 5402(d) requires that the USPS set rates and contract through competitive procedures. Section 5402(f) requires that the USPS pay the rates set by the DOT to an eligible carrier. Subsection (f) deals solely with the USPS's authority to negotiate the terms of its contractual relationships; it has no bearing on the contractual nature of those relationships.

### 2. *Plaintiff as an interested party*

■ Defendant and intervenor also argue that plaintiff is not an "actual or prospective bidder or offeror," as "interested party" has been interpreted, because no competitive procurement procedures are used to allocate mail transportation in Alaska. As noted above, section 1491(b), which was added to the Tucker Act by the Administrative Disputes Resolution Act of 1996 (the "ADRA"), § 12, Pub.L. No. 104–320, 110 Stat. 3870, 3875, does not specifically define the term "interested party." In *AFGE* the Federal Circuit interpreted "interested party" consistent with the Competition in Contracting Act (the "CICA"), 31 U.S.C. § 3551(2) (1994 & Supp. V 1999), thereby resolving a split of authority among the judges of the Court of Federal Claims.[3] 258 F.3d at 1301–02. Sec-

---

3. *Compare AFGE v. United States*, 46 Fed.Cl. 586, 592–95 & n. 12 (2000) (holding that interested party included a "person ... adversely affected or aggrieved by agency action" under the standing provision of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 702 (1994)), *with*

tion 3551 of the CICA delimits the bid protest jurisdiction of the Comptroller General of the General Accounting Office (the "GAO"). Section 3551(2) provides:

The term "interested party", with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.

The Federal Circuit reasoned:

Section 3551, by its own terms, applies only to contract disputes decided by the Comptroller General of the GAO pursuant to 31 U.S.C. §§ 3551–56. However, the fact that Congress used the same term in § 1491(b) as it did in the CICA suggests that Congress intended the same standing requirements that apply to protests brought under the CICA to apply to actions brought under § 1491(b)(1). We therefore construe the term "interested party" in § 1491(b)(1) in accordance with the CICA, and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.

258 F.3d at 1302.

The Federal Circuit's reliance on the CICA in *AFGE* necessarily resulted in a holding that refers exclusively to contracts procured through competition. "Bidder" and "offeror" are terms of art in the realm of Government contracting and refer to responses to Government solicitations and requests for proposals. Plaintiff's argument that it has made a "standing offer," as defined in *Black's Law Dictionary*, ignores the context in which "offer" is used in the CICA, referring to responses to requests for offers

by the Government. By adopting the definition in the CICA, the Federal Circuit implicated an established understanding of the words "bidder" and "offeror" that cannot be divorced from the context of the CICA's requirement of solicitations and competitive proposals. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed.Cir.2001); *Fed. Data Corp. v. United States*, 911 F.2d 699 (Fed.Cir. 1990); *United States v. IBM*, 892 F.2d 1006, 1010–12 (Fed.Cir.1989); *MCI Telecomm. Corp. v. United States*, 878 F.2d 362 (Fed. Cir.1989).[4] *AFGE's* conclusion that "Congress intended standing under [section 1491(b)(1) ] to be limited to disappointed bidders" only reinforces this understanding. 258 F.3d at 1302.

The Comptroller General, responsible for administering section 3551, defines the term "offeror" in that statute according to the definition of "offer" in 48 C.F.R. (FAR) § 2.101 (2001): "[A] response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract." *AFGE*, 2000 Comp. Gen. ¶ 87, at 7 (holding that federal employees and their unions asserting that they will be affected by agency's decision to contract for work rather than perform it in-house are not interested parties because they are not actual or prospective bidders or offerors under solicitation). That definition recognizes two types of offers, "bids" and "proposals": "Responses to invitations for bids (sealed bidding) are offers called *bids* or sealed bids; responses to requests for proposals (negotiation) are offers called proposals; responses to requests for quotations are *not* offers and are called *quotes*." FAR § 2.101; *see also USATREX Int'l, Inc.*, 92–2 Comp. Gen. ¶ 339 ("While USATREX arguably has a direct economic interest in the outcome of the procurement, thus meeting one element of the CICA's definition of an

---

*Ryan Co. v. United States*, 43 Fed.Cl. 646, 656–57 & n. 17 (1999) (holding that 31 U.S.C. § 3551(2) properly defined "interested party").

**4.** *MCI, IBM,* and *Federal Data* each dealt with the term "interested party" as it is used in the Brooks Act, 40 U.S.C. § 759(f)(9)(B) (repealed 1996). Both *MCI* and *IBM* noted Congress's use of the identical term in the CICA. *MCI*, 878 F.2d at 365; *IBM*, 892 F.2d at 1012. *Impresa*, on the

other hand, dealt with a bid protest in the Court of Federal Claims brought under section 1491(b). 238 F.3d at 1329. *Impresa* interpreted "interested party" in the Tucker Act according to the case law dealing with the Brooks Act, noting the use of that term in the CICA. *Id.* at 1334 (discussing *MCI, IBM,* and *Federal Data*); *see also AFGE*, 258 F.3d at 1301 n. 5 (discussing *Impresa*).

interested party, it is not an actual or prospective offeror with respect to the protested solicitation, and therefore does not meet the balance of the interested party standard."). The court is aware of no protests entertained by the GAO that do not involve some degree of competitive procurement or an argument that competition was required. *See, e.g., Panama DOD Employees Coalition,* 91–2 Comp. Gen. ¶ 158, at 2 (rejecting federal employees' protest of agency decision to contract for services rather than perform them with federal employees; employees' asserted violation of executive policy to conduct cost comparison before making such decisions did not involve competitive procurement).

Plaintiff's reliance on cases that entertained bid protests by contractors that were deprived of an opportunity to present an offer, or to have their offer fairly considered, is inapposite. Each of those cases involved a challenge to the Government's observance of the competition requirements of the CICA and its regulations. *See Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 644 (2001); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 732–34, 743–44 (2000); *CHE Consulting v. United States,* 47 Fed.Cl. 331, 332, 335–36 (2000); *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 319, 322–23 (1998); *ATA Def. Indus., Inc. v. United States,* 38 Fed.Cl. 489, 492, 496–97 (1997) *Magnavox Elec. Sys. Co. v. United States,* 26 Cl.Ct. 1373, 1379 (1992). Plaintiff's complaint is not that the USPS prevented it from participating in a fair competition, but that the USPS improperly determined that plaintiff was statutorily ineligible to receive an equitable distribution of the mails.

Plaintiff does not dispute that no solicitation or request for proposals has taken place, or that no bid or competitive proposal has been tendered. Instead, qualified carriers unilaterally claim what appears to be a quasi-entitlement to receive an equitable distribution of mail that would otherwise go to mainline carriers. The USPS determines whether the carrier is eligible under section 5402(g) and whether the equalization offers "definite service advantage over existing transportation." [5] As defendant states: "[T]here was no bid for [plaintiff] to protest." Def.'s Br. filed Sept. 17, 2001, at 12.

Conceding that no solicitation or request for proposals is involved, plaintiff attempts to broaden the definition of "interested party" given in *AFGE* by reading it along with the word "procurement" in the same statute. Plaintiff's argument is not without merit. If "procurement" has a more expansive definition than "contract" or "bid," then a narrow definition of "interested party" would appear to be contrary to legislative intent—that is, if Congress intended to give the court jurisdiction over "procurements" beyond competitive solicitations and requests for proposals, that intent would be defeated by requiring a traditional, formal contracting scenario as a prerequisite to standing.

Defendant and Intervenor's arguments on this subject simply miss the point. It doesn't matter if bidding is involved; it doesn't matter if there is no written contract; it doesn't matter how the Postal Service arrived at its decision. The Postal Service intends to procure air carriers' services to transport mail along mainline routes in Alaska, and to exclude Plaintiff Alaska Central from this proposed pro-

**5.** Although the court takes no position as to the discretion of the USPS to contract with eligible carriers, the court queries whether the flaw in plaintiff's characterization of this case as a bid protest stems from its characterization of itself as the "offeror." The more appropriate argument may be that the Government is the offeror, and that plaintiff has accepted the Government's offer. *See N.Y. Airways, Inc. v. United States,* 177 Ct.Cl. 800, 816–17, 369 F.2d 743, 751–52 (1966); *Baker v. United States,* No. 00–754C, 50 Fed.Cl. 483 (Fed.Cl. 2001). This may simply be another way of saying that the statute at issue is money-mandating, *see Grav v. United States,* 14 Cl.Ct. 390, 394 (1988), *aff'd,* 886 F.2d 1305 (Fed.Cir.

1989), but if this is the case—and neither party has raised or briefed the issue—then this is a section 1491(a) case, which would go a long way to explaining the difficulty that has been encountered trying to fit these facts into the bid protest provision of the Tucker Act. Under section 1491(a) plaintiff would be pursuing money damages for the decision to exclude. As discussed above, however, the complaint does not allege the existence of an express or implied contract with the United States or the violation of a money-mandating statute or regulation, and plaintiff did not argue the propriety of jurisdiction under section 1491(a) in its response to defendant's motion to dismiss.

curement, contrary to applicable statutes and regulations. Under the language of the ADRA, as broadly construed by this Court and the Federal Circuit, Plaintiff Alaska Central alleges a violation of statutes and regulations in connection with a procurement or proposed procurement, and this Court has jurisdiction to entertain this action.

Pl.'s Br. filed Oct. 1, 2001, at 13–14.

The CICA and the ADRA are, after all, different statutes, with different definitions of bid protest. *Compare* 31 U.S.C. § 3551(1) *with* 28 U.S.C. § 1491(b)(1). Moreover, the definition of "interested party" in the CICA expressly cross-references the CICA's own definition of bid protest. *See also AFGE,* 258 F.3d at 1302 (noting that "[s]ection 3551, by its own terms, applies only to contract disputes decided by the Comptroller General of the GAO"). The transposition of "interested party" between the two statutes appears inartful. Several opinions issued by the Court of Federal Claims prior to *AFGE* made similar observations. These cases, however, are suspect after the Federal Circuit's decision in *AFGE*.

Plaintiff relies principally on the following language in *CHE,* 47 Fed.Cl. at 337–38:

> Although this court has often applied the definition of interested party contained in the [CICA], there are textual differences between that statute and the ADRA amendments to the Tucker Act conferring post-award bid protest jurisdiction on this court. The issue of standing as it relates to post-award bid protests should therefore also be examined in the context of the particular statute granting this court post award bid protest jurisdiction.
>
> The [CICA] limits the phrase "interested party" to use in connection with contracts, solicitations, or requests for offers. The language of the ADRA is not so limited. The ADRA contemplates a situation where a plaintiff alleges a violation of statute or regulation "in connection with a procurement or a proposed procurement" in circumstances that do not, by the terms of the statute, require there to be a contract, solicitation, or request for offer. The differences between these two statutes

are significant enough that the court should not leap to a conclusion that standing under the ADRA is identical to the [CICA] definition of "interested party."

*CHE* was decided before the Federal Circuit issued its ruling in *AFGE*. In fact, *CHE* cited as support for the above passage the trial court's decision in *AFGE,* which also relied on the jurisdiction over "any alleged violation of a statute or regulation in connection with a procurement or proposed procurement" to determine that standing under the ADRA is more expansive than standing under the CICA. 46 Fed.Cl. at 595; *see also Phoenix Air Group, Inc. v. United States,* 46 Fed.Cl. 90, 101–02 (2000) (treating CICA definition of "interested party" as instructive, but not conclusive due to differences in bid protest jurisdiction of GAO and Court of Federal Claims); *ATA,* 38 Fed.Cl. at 494 ("The definition of 'interested party' in Section 3551(2) arguably is more narrow than the definition that would flow from the plain meaning of Section 1491(b).").

In contrast, the court in *CCL* suggested that no practical difference exists between the two statutes. 39 Fed.Cl. at 789–90. The court reasoned that "it does not follow that [the CICA definition] necessarily represents the four corners of potential standing under the new legislation," *id.* at 789, for, unlike the ADRA, the GAO statute does not provide jurisdiction over violations of statutes in connection with a procurement.

> While as a practical matter there normally will be no difference in the grants of authority, the differences in language warrant some caution about presumptively limiting standing to the GAO definition of "interested party." ... The court notes, in any event, that the GAO definition has been judicially construed to apply to persons who would have submitted a bid if given the opportunity.

*Id.* at 790.

In pursuing its construction of section 1491(b)(1), plaintiff necessarily argues that the Federal Circuit did not mean what it said in *AFGE*. It is true that *AFGE* dealt with the more extreme argument that "interested party" should be defined according to the

broader APA standing requirements. Plaintiffs in *AFGE* were members of a federal employee's union objecting to a cost-comparison analysis conducted by the Government to determine whether certain services could be performed more economically by a private sector source than by the Government. Because plaintiffs were not contractors themselves, their standing in that case could only be predicated on their being "adversely affected or aggrieved by agency action" under the APA's standing provision, 5 U.S.C. § 702. Additionally, the cases questioning the absolute interchangeability of "interested party" between the two statutes never squarely presented the issue: The court either found that the plaintiffs in those cases met the CICA definition or failed the APA definition. *CHE*, 47 Fed.Cl. at 339–40; *Phoenix Air Group*, 46 Fed.Cl. at 102; *ATA Defense Indus.*, 38 Fed.Cl. at 494.

Although the Federal Circuit panel in *AFGE* did not say so directly, its statements adopting the definition of interested party from the CICA can only mean that it rejected the reasoning of the Court of Federal Claims in the above-cited cases "that the term 'interested party' under the ADRA is not limited to those parties covered by CICA." *AFGE*, 46 Fed.Cl. at 592. Particularly, the Federal Circuit implicitly rejected the argument made by the trial court in that case, and by plaintiff here, that the ADRA's use of the word "procurement" separately from "solicitation" and "contract" requires an equally expansive definition of "interested party."

Plaintiff's argument is not assisted by the Federal Circuit's statement in *AFGE* that "[it is the intention of the [ADRA] to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims.]" 258 F.3d at 1300 (quoting H.R. Conf. Rep. No. 104–841, at 10 (1996)); *accord Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071 (Fed.Cir.2001) (discussing legislative history of ADRA). The holding in *AFGE* is based on that panel's conclusion that the jurisdiction of the federal district courts under *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), was limited to "bid protest cases brought under the APA by disappointed bidders." *AFGE*, 258 F.3d at 1301.[6]

Nor does the Federal Circuit's decision in *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286 (Fed.Cir.1999), advance plaintiff's case. In *RAMCOR* the Federal Circuit recognized the sweeping scope of the words "in connection with" in section 1491(b):

> The language of § 1491(b), however, does not require an objection to the actual contract procurement, but only to the "violation of a statute or regulation in connection with a procurement or a proposed procurement." The operative phrase "in connection with" is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction.... Where an agency's actions under a statute so clearly affect the award and performance of a contract, this court has little difficulty concluding that that statute has a "connection with a procurement."

*Id.*, at 1289. *RAMCOR* does little to illuminate the scope of "procurement." The plaintiff in *RAMCOR* was an incumbent contractor whose proposal for a new contract was

---

**6.** Plaintiff quotes language in *Emery* that, in turn, quotes statements made by Sen. Carl Levin, implying a wider category of procurement jurisdiction beyond bid protests:

> Senator Levin, who introduced the ADRA legislation, recognized that the sunset provision [§ 12(d), 110 Stat. at 3875] applied not only to bid protests, but to procurement protests in general: "After 4 years, the jurisdiction of the district courts would terminate, and the Court of Federal Claims would exercise judicial jurisdiction over procurement protests."

*Emery*, 264 F.3d at 1079 (quoting 142 Cong. Rec. S26646 (1996)). The court notes that Sen. Levin also used the term "procurement protests" to describe the jurisdiction of the GAO. Moreover, Sen. William Cohen said almost the opposite at the same floor debate: "The amendment will expand the bid protest jurisdiction of the Court of Federal Claims. It should be noted, however, that this amendment in no way expands the jurisdiction of the Court of Federal Claims beyond bid protests...." 142 Cong. Rec. S26645 (1996). Rather than shed any light on the intent of the Congress and the Executive that passed the ADRA, these quotations illustrate the unreliability of floor statements as instructive legislative history.

excluded by the Government as ineligible. *RAMCOR*, despite its statement that actions that "clearly affect the award and performance of a contract ... has a connection with a procurement,". dealt solely with the phrase "in connection with," and is therefore consistent with the narrow definition of interested party given by *AFGE*.

Plaintiff further suggested at oral argument that the ADRA's reference to "proposed procurement" necessarily contemplates situations where no formal solicitation has occurred. The court construes the qualifier as simply expanding the court's jurisdiction to situations in which competitive solicitations are proposed, but, for one reason or another, are not conducted. Under the ADRA an interested party—a plaintiff who would have submitted a bid or offer had the solicitation been conducted—may challenge the violation of a statute or regulation in connection with that proposed solicitation.

As recognized by the Federal Circuit, the statute is ambiguous. *See AFGE*, 258 F.3d at 1299, 1302. The efforts of both parties to resolve this ambiguity in their briefs and at oral argument were well-reasoned and compelling. The ambiguity nevertheless must be resolved against an expansion of jurisdiction, thus against an expansion of the sovereign's consent to be sued. *McMahon v. United States*, 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951) ("[S]tatutes which waive immunity of the United States from suit are to be construed strictly in favor of the sovereign."); *AFGE*, 258 F.3d at 1301. Plaintiff has not persuaded the court that Congress's use of the word "procurement" reveals such an intent.

The court acknowledges the peculiarity of this holding. The record reveals a private entity that would be contracting with the Government for the transportation of mail but for the Government's interpretation of a statute governing such contracts. The court holds that the plaintiff has no standing to protest this interpretation under 28 U.S.C. § 1491(b)(1) because the contract was not obtained through competitive procedures, and plaintiff is not arguing that the contract should have been subject to competitive procedures. Section 1491(b)(1) broadly refers to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Nevertheless, because this court applies the definition of standing under the CICA, the court lacks jurisdiction to hear plaintiff's case. Standing under section 1491(b)(1) is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Plaintiff is not a bidder or offeror.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss pursuant to RCFC 12(b)(1) is granted, and the Clerk of the Court shall dismiss the complaint without prejudice for lack of jurisdiction.

**IT IS SO ORDERED.**

No costs.